<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE LIGHTHOUSE INSTITUTE FOR EVANGELISM, INC. d/b/a THE LIGHTHOUSE MISSION, and REVEREND KEVIN BROWN <br><br> Plaintiffs, <br><br> v. <br><br> THE CITY OF LONG BRANCH, BCIC FUNDING CORP., BREEN CAPITAL SERVICES, INC., ABRAMS GATTA & FALVO, P.C., PETER S. FALVO, ESQ., EUGENE M. LAVERGNE, ESQ., and JOHN DOES A-Z <br><br> Defendants. | : <br> : <br> : <br> : <br> : <br> : **OPINION** <br> : **Civil Action No. 00-3366** <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |

<u>**Walls, District Judge**</u>

Defendants Abrams Gatta & Falvo, P.C. ("AG&F") and Peter S. Falvo, Esq. ("Falvo")

(together, the "Falvo Defendants") move for summary judgment. Pursuant to Fed.R.Civ.P. 78,

the motion is decided without oral argument. The motion is denied.

## FACTS AND BACKGROUND

Plaintiff The Lighthouse Institute for Evangelism, Inc. d/b/a The Lighthouse Mission (the

"Mission"), is a New Jersey Title 15A non-profit corporation. <u>Amended Compl.</u> ¶ 1. Formed in

1991, the Mission exists to: (a) administer to its congregation while living, practicing, and

proclaiming the teachings of the New Testament and gospel of Jesus Christ; (b) operate a

**NOT FOR PUBLICATION**

ministry school for purposes of credentialing, licensing, and ordaining qualified individuals who seek formal ministry; and (c) operate benevolent services and agencies to the community through outreach of membership. Id. Plaintiff Reverend Kevin Brown ("Reverend Brown") is an ordained Baptist minister who has been the Mission's presiding minister since its inception. Id. ¶ 2.

Defendant Peter Falvo is an attorney who was counsel for the Mission from approximately spring 1994 through January 16, 1997. At all times relevant, Falvo was a partner in the law firm of AG&F, also a defendant in this suit. Id. ¶¶ 6, 7. Plaintiffs allege that the Falvo Defendants have caused them damages based upon their representation of plaintiffs in connection with an application for a use variance in the City of Long Branch.

In March of 1992, plaintiffs began renting space at 159 Broadway, Long Branch, New Jersey, which they utilized for Bible studies, public prayer meetings, community services and to provide free meals to the homeless. Id. ¶¶ 10-11. The property at 159 Broadway is located in Long Branch's C-1 commercial district. Pursuant to section 20-6.13 of Long Branch's Zoning Ordinance, a church is not a permitted use within that zone. Id. ¶ 23 From mid-1993 to 1994, plaintiffs sought to move the location of the Mission to a then-abandoned building across the street at 162 Broadway, which is also located in Long Branch's C-1 commercial district. See Defendants' Statement of Facts ("Def. Facts") ¶5. At some point in 1993, plaintiffs applied for a mini-grant from Long Branch's Office of Community and Economic Development (the "OCED"). The parties dispute whether the grant was sought in anticipation of the move to 162 Broadway or for the Mission's original location. See Def. Facts ¶ 7; Pl. Facts ¶ 5. In response to

**NOT FOR PUBLICATION**

plaintiffs' application, the OCED advised plaintiffs that their proposed use of the building at 162 might not be legal, but rewarded plaintiffs a $1500 grant nonetheless. Def. Facts ¶8; Pl. Facts ¶6. Despite this warning, plaintiffs decided to purchase the property without first obtaining a use variance. Def. Facts ¶ 9.

When plaintiffs purchased 162 Broadway it was in a state of disrepair and plaintiffs planned to make improvements. In February 1994, an AT&T charitable group known as the "Pioneers" agreed to provide funding for refurbishment of the property. However, the AT&T Pioneers withdrew their funding in September 2005 after plaintiffs were unable to obtain the use variance. Dr. Ralph Wyndrum, Jr., president of the local AT&T Pioneers chapter at the time, testifies that funding was revoked because other projects needed the Pioneers' funding, and that plaintiffs could have made a renewed pitch for the Pioneers' funding after the use variance had been obtained. See Wyndrum Cert. ¶¶6,7.

The Falvo Defendants began representing plaintiffs in November 1994, in connection with the purchase of the property at 162 Broadway. Falvo claims that before the closing he advised Reverend Brown that plaintiffs should not close on the property without approval for a use variance because a church would not be permitted in the C-1 zone. Def. Facts ¶ 19. Plaintiffs deny that Falvo offered this advice. Pl. Facts ¶ 12. On November 8, 1994, plaintiffs closed on 162 Broadway, and that same day sought advice from Falvo on how to obtain a tax exemption based on the Mission's status as a not-for profit organization.

The Falvo Defendants claim that Falvo advised Reverend Brown that plaintiffs would first need to obtain a use variance to operate as a church or soup kitchen, and that to obtain a

3

**NOT FOR PUBLICATION**

variance, he would need floor plans signed and sealed by an engineer or an architect. Def. Facts
¶¶ 22, 23. Falvo also claims that Reverend Brown told him he knew someone who could provide
floor plans. Id. ¶ 24. On December 14, 1994, Reverend Brown sent Falvo a sketch of the floor
plans and description of the intended use for the space, along with a cover letter instructing Falvo
to "review and feel free to comment before I draw up something more appropriate for application
purposes. I understand that construction drawings will have to be more elaborate and they are
being drawn up now...Please contact me when you want us to come in and begin the process."
Certification of Patrick Minter, ("Minter Cert.") Ex. F.

From December 1994 to August 1995, Falvo and Reverend Brown communicated about
the Mission's application, but now disagree as to who was ultimately responsible for taking steps
to finalize the application.  Plaintiffs contend that by December 14, 1994, Falvo had everything
he needed to prepare and submit Plaintiffs' use variance application. Pl. Facts ¶ 17. Plaintiffs
also contend that Falvo undertook to obtain final versions of the Mission's floor plans, which
were required for the use variance application. The Falvo Defendants vigorously disputed this
allegation, and argue that Reverend Brown's testimony on this issue is inconsistent. It is
undisputed, however, that Falvo did not file plaintiffs' use variance application until August
1995. Def. Facts ¶ 29. On August 21, 1995, the city of Long Branch denied plaintiffs'
application because it was incomplete. Specifically, the application had not been completely
filled out, the floor plans did not have titled block, date, seal or signature, the surveys were not
sealed, and the fees had not been submitted. See Minter Cert., Ex. H.

In early 1995, Reverend Brown received notification that taxes on 162 Broadway were

4

**NOT FOR PUBLICATION**

due for the remainder of 1994, although the money for the 1994 taxes had been placed into escrow at the closing.  Decl. of Reverend Brown ( "Brown Decl.") ¶ 20.

On August 31, 1995, Falvo wrote to Reverend Brown informing him that he would have the surveys resealed, fill in any blanks on the application form and calculate the fees owed by Plaintiffs.  Brown Decl. Ex. D.  Although Reverend Brown wanted to approach Long Branch about waiving the fees, Falvo suggested that Plaintiffs pay the fees up front so as to complete the application.  (Id.)  Falvo asked Reverend Brown to have a title block, date, seal and signature placed on the plans.  (Id.)

On September 15, 1995, Falvo sent 10 copies of the survey duly sealed to the Planning Board Secretary and a letter informing her that he was making arrangements to have the floor plans signed and sealed by the professional who prepared them.  Falvo also asked the Planning Board Secretary to examine the file for 162 Broadway and determine what fees were required by way of application fee and escrow so that plaintiffs could submit them. Def. Facts ¶¶ 31-36.

On November 14, 1995, Falvo wrote a letter to Concept Engineering Consultants, P.A., requesting floor plans with a title block, date, seal and signature even though he claims he had asked Reverend Brown to handle those matters.  Id. ¶ 37. However, Falvo's efforts were apparently fruitless as indicated by a January 15, 1996 letter in which he informed Reverend Brown that the plans still needed a title block, date, seal and signature of an architect or engineer and that the application would not be heard unless the taxes on the property were paid up to the current amount due for 1995.  Id. ¶ 41.  Falvo further informed Reverend Brown of the fees required to file his development application, totaling $600.00 in administrative fees and $900.00

5

**NOT FOR PUBLICATION**

in escrow fees, and advised him that the Planning Board might waive the administrative fees but
not the escrow fees. Falvo asked Reverend Brown to indicate whether he would like Falvo to
approach the Board to request a waiver. Id. ¶ 42.

On February 9, 1996, Falvo wrote again to Reverend Brown informing him, inter alia,
that 1995 taxes had to be paid in order for the Board to have jurisdiction over Plaintiffs'
Application and that while he might be able to get the administrative application fees waived,
Reverend Brown or the Mission would have to pay the escrow fees. Def. Facts ¶ 42. Falvo
wrote that until the various issues discussed in the letter were resolved, the application was "dead
in the water." Id. ¶ 43. On February 13, 1996, Reverend Brown responded to Falvo by letter
stating that he "guesstimates needing $7000.00 to proceed with the application" and that until he
has it he will have to "sit on the application." Minter Cert. Ex. P.

Plaintiffs contend that had Falvo advised Reverend Brown that October 1 was the
determinative date for a property exemption, or that November 1 is the deadline to file for a tax
exemption, he would not have told Falvo to "sit on the application." Pl. Facts ¶ 22. Plaintiffs
further contend that Falvo misled them by suggesting that as a prerequisite for their application to
be considered, all taxes on the property must be kept current. Pl. Facts ¶¶ 22-24. They argue that
Falvo should have advised them of Long Branch Ordinance 69-35 which provides for
"flexibility, negotiation and accommodation with regard to the payment of taxes." Id.[1]

---

[1] Long Branch Ordinance 69-35 reads as follows:
[E]very application for development submitted to the Planning Board or to the
Zoning Board of Adjustment shall be accompanied by proof that no taxes or
assessments for local improvements are due or delinquent on the property which
is the subject of such application; or, if it is shown that taxes or assessments are

6

**NOT FOR PUBLICATION**

Plaintiffs also contend that Falvo agreed to pursue Reverend Brown's alternative strategy "to peel away all the sugar coating on the use and move directly to use as a 'CHURCH'," but he never followed up. Id. ¶ 25. Falvo acknowledged that "just go[ing] in for a church would be a lot quicker and cleaner and they would have a much more difficult time in turning you down." Id. He stated that "he would be more than happy to 'pick up where we left off' [with Reverend Brown's "CHURCH" suggestion] once we were 'in a position to do something.'" Id. However, plaintiffs allege that Falvo's "prerequisite of [Plaintiffs] being 'in a position to do something'" refers their raising approximately $7000 to cover taxes and fees, which they contend should not have been required of them in the first place. Id. Approximately seven months later, Reverend Brown informed Falvo that he had the money to pay the1995 taxes and administrative fees, but Falvo asserts that the application still could not be considered because plaintiffs had not paid taxes for 1996. Def. Facts ¶ 49.

On October 16, 1996, Falvo advised Plaintiffs that he could no longer represent them and requested that he be relieved as counsel. Def. Facts ¶ 50. Reverend Brown and Falvo agreed that representation would not end until plaintiffs retained new counsel. Id. ¶ 51. Plaintiffs subsequently retained Defendant LaVergne to whom Falvo forwarded Plaintiffs' file on or about January 16, 1997. Id. ¶53. Plaintiffs allege that Falvo abandoned the Mission's application and that Falvo did not advise plaintiffs regarding the status of the file, potential legal issues upon

---

delinquent on said property, any approvals or other relief granted by either board shall be conditioned upon either the prompt payment of such taxes or assessments or the making of adequate provision for the payment thereof in such manner that the city will be adequately protected."

NOT FOR PUBLICATION

transfer of the file, what needed to be done to successfully achieve their goal of obtaining use, and whether there were any applicable time deadlines. Pl. Facts ¶ 26. Plaintiffs also argue that Falvo did not pursue alternative remedies, including any options available to Plaintiffs under Long Beach Ordinance 69-35 or the possibility that Long Branch had violated Plaintiffs' constitutional rights. Id.

On June 8, 2000, plaintiffs filed a Complaint against Long Branch, the Falvo Defendants and others in the Superior Court of New Jersey, Monmouth County. On July 12, 2000, the case was removed to this Court pursuant to 28 U.S.C. § 1441. On October 23, 2000, Plaintiffs filed an amended complaint. The amended complaint asserts two claims against the Falvo Defendants: legal malpractice (Count X) and unjust taxation (Count XII). On March 8, 2001, the Falvo Defendants filed a motion for summary judgment, which the Court denied on April 7, 2003, finding that a disputed issue of material fact existed as to whether the Falvo Defendants breached duty to plaintiffs. Discovery is now complete and the Falvo Defendants renew their motion for summary judgment.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Chippollini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d Cir.) (en banc), cert. denied, 483 U.S. 1052 (1987). In deciding a motion for summary judgment, a court must construe all facts and inferences in the

**NOT FOR PUBLICATION**

light most favorable to the nonmoving party. Boyle v. Allegheny, Pa., 139 F.3d 386, 393 (3d Cir.

1998). The moving party bears the burden of establishing that no genuine issue of material fact

remains. Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

The Supreme Court has stated that in evaluating a motion for summary judgment:

> The judge must ask . . . not whether . . . the evidence unmistakably
> favors one side or the other but whether a fair-minded jury could
> return a verdict for the [nonmovant] on the evidence presented.
> The mere existence of a scintilla of evidence in support of the
> [nonmovant's] position will be insufficient; there must be evidence
> on which the jury could reasonably find for the [nonmovant]. The
> judge's inquiry, therefore, unavoidably asks whether reasonable
> jurors could find by a preponderance of the evidence that the
> [nonmovant] is entitled to a verdict. . . .

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). A fact is "material" only if it will

affect the outcome of a lawsuit under the applicable law, and a dispute over a material fact is

"genuine" if the evidence is such that a reasonable fact finder could return a verdict for the

nonmoving party. See id.

To survive a motion for summary judgment, a nonmovant must present more than a mere

scintilla of evidence in his favor. Id. He cannot simply reassert factually unsupported allegations

contained in his pleadings. See Celotex, 477 U.S. at 325; Clark v. Clabaugh, 20 F.3d 1290, 1294

(3d Cir. 1994). Further, only evidence that would be admissible at trial may be used to test a

summary judgment motion; evidence with a deficient foundation must be excluded from

consideration. Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460 (3d Cir. 1989).

## DISCUSSION

An action for legal malpractice is based upon the usual principles of negligence: duty,

9

**NOT FOR PUBLICATION**

breach, causation and harm. <u>Conklin v. Hannoch Weisman</u>, 145 N.J. 395, 416 (1996). To succeed on a claim for legal malpractice, a plaintiff must establish: (1) the existence of an attorney-client relationship creating a duty of care upon the attorney; (2) that the attorney breached the duty owed; (3) that the breach was a proximate cause of any damages sustained; and (4) that actual damages were incurred. <u>Sommers v. McKinney</u>, 287 N.J. Super 1, 9-10 (App. Div. 1996).

Generally, "an attorney is only responsible for a client's loss if that loss is proximately caused by the attorney's legal malpractice." <u>2175 Lemoine Ave. Corp. v. Finco, Inc.</u>, 272 N.J. Super. 478, 487 (App. Div. 1994). The test of proximate causation "is satisfied where the negligent conduct is a substantial contributing factor in causing the loss." <u>Id.</u> In considering this element, an "actor's negligent conduct is not a substantial factor in bring about harm to another if it would have been sustained even if the actor had not been negligent." <u>Kulas v. Public Serv. Elec. and Gas Co.</u>, 41 N.J. 311, 317 (1964). It is the client's burden to show what injuries it suffered as a proximate consequence of the attorney's breach of duty. <u>Lieberman v. Employers Ins. of Wausau</u>, 84 N.J. 325, 341 (1980)); <u>2175 Lemoine Ave.</u>, 272 N.J. Super. at 488. This determination is ordinarily made by the jury, but "[w]here . . . there is no genuine issue of material fact in dispute as to proximate cause, the issue may properly be resolved on summary judgment." <u>RTC Mortgage Trust 1994 N-1 v. Fid. Nat'l Title Ins. Co.</u>, 58 F. Supp. 2d 503, 526 (D.N.J. 1999).

On this renewed motion for summary judgment, the Falvo Defendants contend that their conduct did not proximately cause the alleged damages sustained by plaintiffs. Plaintiffs argue

10

**NOT FOR PUBLICATION**

that there is a disputed issue of material fact as to whether Falvo's alleged negligence
substantially contributed to their injuries.

## I.    Ambrosio Report

Plaintiffs submit an expert report of Anthony Ambrosio, Esq. (the "Ambrosio Report") in
support of their position that the Falvo Defendants deviated from the relevant standard of care
and that this deviation was a substantial contributing factor in plaintiffs' alleged loss. Plaintiffs
assert that the Ambrosio Report creates a material issue of fact for the jury, arguing that a
properly prepared expert report in a legal malpractice case in and of itself creates a jury question
and necessitates denial of summary judgment. See Cellucci v. Bronstein, 277 N.J. Super. 506,
524 (App.Div. 1994) (citing Ziegelheim v. Apollo, 128 N.J. 250, 264 (1992)).

The Falvo Defendants argue that the Ambrosio Report does not create an issue of fact
because it constitutes a "net opinion" under New Jersey law. New Jersey courts have repeatedly
held that an expert opinion is inadmissible at trial if it is based upon pure speculation,
possibilities or contingencies. Buckelew v. Grossbard, 87 N.J. 512, (1981) (the net opinion rule
is "[a] restatement of the established rule that an expert's bare conclusion, unsupported by factual
evidence, is inadmissible."). If an expert report without a factual foundation is inadmissible, it
cannot defeat a motion for summary judgment. See Advo, Inc. v. Philadelphia Newspapers, Inc.,
51 F.3d 1191, 1198 (3d Cir. 1995).

As a preliminary matter, it must be noted that plaintiffs misconstrue the holding in
Cellucci. That case does not stand for the proposition that an expert report automatically creates
a question of fact, but rather held that an expert report is insufficient to prevent dismissal when it

**NOT FOR PUBLICATION**

fails to apply recognized standards of care to its analysis. See Cellucci, 277 N.J. Super. at 523. Although the court in Ziegelheim found that the defendant's recognition of his opponent's expert opinion was a "virtual" concession that a genuine issue of fact remained, Ziegelheim in no way created a rule that an expert report, no matter how cursory, is sufficient to defeat summary judgment.

The Ambrosio Report incorporates the factual background as described in this Court's April 7, 2003 opinion denying the Falvo Defendants' first motion for summary judgment. The report then goes on to state the *prima facie* elements of a legal malpractice case. Ambrosio then cites to rules 1.3 and 1.4 of the Rules of Professional Conduct and concludes that "had Falvo acted in a timely manner and filed Plaintiffs' Application with the Planning Board while Plaintiffs' taxes were current, Plaintiffs may have been able to obtain a use variance (as a Church) which would permit them to secure tax exempt status for the subsequent years for which they were assessed taxes." Ambrosio also opines that "Falvo's negligence and legal malpractice was a substantial contributing factor to Plaintiffs not obtaining a use variance as a church and the corresponding tax exemption for religious organizations." Ambrosio Report at 7.

Although Ambrosio's exposition on the applicable standards of care might have been more thorough, his opinion does not constitute a "net opinion." The Rules of Professional Conduct, while not evidence of *per se* negligence, are evidence of the standard of care applicable to attorneys practicing in this state and Ambrosio's opinions are adequately supported by the factual statement included in the report.

**NOT FOR PUBLICATION**

**II.     Proximate Causation**

In their renewed motion for summary judgment, the Falvo Defendants argue that their

conduct did not proximately cause the alleged damages sustained by plaintiffs. Specifically, the

Falvo Defendants argue that plaintiffs would not have obtained a use variance even if Falvo had

submitted their application by the end of 1994, because that application would have been

incomplete. Plaintiffs argue that it was Falvo's failure to diligently pursue the application before

the end of the 1994 tax year and to keep them apprised of the relevant filing deadlines that

delayed completion of the use variance application.

**A.     Plaintiffs' Failure to Provide Final Floor Plan**

The Falvo Defendants argue that plaintiffs would not have obtained a use variance even if

Falvo had submitted their application in December 1994, because that application would have

been incomplete. Specifically, the Falvo Defendants assert that the floor plans provided by

Reverend Brown in December 1994 were incomplete. Reverend Brown acknowledged this in a

letter to Falvo on December 14, 1994. See Minter Cert. Ex. F.

Although Brown's December 14 letter to Falvo acknowledges that the floor plan is not

final, he also asks for Falvo's comments on the plan and instructs Falvo to contact him when

Falvo was ready for Reverend Brown to "come in and begin the [application] process." Id.  In

addition, Reverend Brown alleges that Falvo told him that Brown himself could vouch for the

floor plan's accuracy (presumably obviating the need for a formal "title block") and that Falvo

assumed responsibility for following up with John Plaskonka ("Plaskonka"), an engineer who

had allegedly offered his services to Reverend Brown and who was qualified to complete the

**NOT FOR PUBLICATION**

floor plans.  See Pl's Facts ¶¶ 12-16.  Plaintiffs also argue that Falvo's failure to instruct them as to the relevant deadlines and other time considerations "substantially contributed" to their failure to produce a complete variance application by the end of 1994.

The Falvo Defendants argue that the Court must disregard Reverend Brown's certification regarding Plaskonka because his statements there are inconsistent with his deposition testimony.  In plaintiffs' statement of facts, which is signed by Reverend Brown, plaintiffs allege Reverend Brown advised Falvo that he had met Plaskonka in September 1994, and that Plaskonka offered his services to the Mission.  Reverend Brown further alleges he gave Falvo Plaskonka's business card and that Falvo said "I know John [Plaskonka], he is a good guy and I have worked with him before and we have no problems, we are good to go."  Pl's Facts ¶ 13.  However, Reverend Brown testified at his deposition that during a late 1995 conversation regarding completion of the floor plans, he told Falvo that he "wouldn't know of any" architects who could verify the accuracy of the plans, and in response Falvo said "Alright.  Let me see what I can do."  See Minter Cert., Ex. D. 109: 13-22.

On a motion for summary judgment, the non-moving part may not create a genuine issue of material fact by submitting an affidavit of a witness that contradicts that witness's earlier sworn testimony.  See Moore v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 1991 WL 149881 at *2 (D.N.J. July 23, 1991) (citing Martin v. Merrill Dow Pharmaceuticals, Inc., 851 F.2d 703, 705 (3d Cir. 1988).  This rule applies where "the affiant was carefully questioned on the issue" and a plaintiff's affidavit is properly disregarded when "plaintiffs face almost certain defeat on summary judgment" and "which flatly contradicts" numerous prior statements.  Martin, 851 F.2d

14

**NOT FOR PUBLICATION**

at 706. Although Reverend Brown's testimony regarding Plaskonka is somewhat inconsistent, the deposition testimony before the Court does not reveal that Reverend Brown was "carefully questioned" on this issue, nor do Reverend Brown's statements here "flatly contradict numerous prior statements." Id. The deposition testimony submitted by the Falvo Defendants consists of one question about what Falvo and Reverend Brown decided to do after the original architect moved away. Reverend Brown answered somewhat vaguely that he could not recall if Falvo suggested getting another architect, but that Reverend Brown "wouldn't know of any." In light the firm and precise statements about Plaskonka in Reverend Brown's current certification, Reverend Brown may face significant credibility issues on this point. However, credibility issues are not to be decided by the Court. The Court finds that, under the circumstances, Reverend Brown's testimony should not be disregarded. Even if the Court were to disregard Reverend Brown's testimony about Plaskonka, there are still disputed issues as to whether Falvo undertook to retain someone else who could sign the floor plans and to whether Falvo was negligent in failing to apprise plaintiffs of the various deadlines relevant to the use variance application.

The Court finds that there are disputed issues of material fact as to whether Falvo undertook, and was negligent in failing, to obtain the documentation necessary to complete plaintiffs' application in a timely fashion, so a reasonable jury could conclude that this delay substantially contributed to plaintiffs' injuries.

**B.    Plaintiffs' Taxes**

The Falvo Defendants also argue that plaintiffs' application would not have been deemed complete if submitted anytime after December 31, 1994 because their property taxes were in

15

**NOT FOR PUBLICATION**

arrears.  However, plaintiffs allege that their injury was caused by Falvo's failure to prepare and submit their complete application *before* the end of the 1994 tax year.  It is undisputed that plaintiffs' 1994 taxes were paid in full on November 9, 1994.  As discussed, there is a disputed issue of material fact as to whether Falvo was responsible for the delay in submitting plaintiffs' application.  See Ambrosio Report at 7.  If the finder of fact were to determine that Falvo's negligence caused the delay in the completion of plaintiffs' application, then it is irrelevant whether plaintiffs' taxes were in arrears at a later date.  Viewing the facts in the light most favorable to plaintiffs, a jury could reasonably conclude that Falvo's conduct substantially contributed to plaintiffs' inability to obtain a use variance, and therefore a tax exemption before plaintiffs' 1995 taxes became due.

The Falvo Defendants also argue that even if plaintiffs' had obtained a use variance, they would not have been entitled to tax-exempt status under N.J.S.A. 54:4-3.6 for 1995 because they did not apply for a tax exemption before the October 1, 2004 assessment date.  It is well-settled that the use of a property on October 1 of the pre-tax year determines whether or not it is to receive an exemption from taxation for the succeeding year.  See N.J.S.A. 54:4-23; N.J.S.A. 54:4-35; Bethany Baptist Church v. Deptford Township, 225 N.J.Super. 355, 359 (App.Div. 1988).  Plaintiffs did not acquire the 162 Broadway property until November 8, 2004.  Even assuming plaintiffs could immediately use the property for a tax-exempt purpose, it would have been impossible for them to obtain a tax exemption for 1995.  For this reason, the Falvo Defendants could not have been responsible for plaintiffs' failure to obtain tax-exempt status during 1995.

**NOT FOR PUBLICATION**

This alone would not, however, excuse the Falvo Defendants' alleged delay in preparing plaintiffs' application for a tax exemption in time for the October 1, 1995 and October 1, 1996 assessment dates, which plaintiffs allege would have been possible if the use variance had been in place before plaintiffs' 1995 taxes became due. As discussed, there is a material issue of disputed fact as to whether plaintiffs' failure to secure a use variance was caused by Falvo's negligence. If a jury were to find that it was, it could also find that the Falvo Defendants were negligent in failing to seek a tax exemption for 1996 and 1997.

The Falvo Defendants also argue that their alleged negligence could not have caused plaintiffs' injuries in later tax years because plaintiffs never used the 162 Broadway property in a manner that would allow it to obtain a tax exemption. The Falvo Defendants claim that throughout the time they represented plaintiffs, 162 Broadway was an unoccupied building which required substantial construction and renovations before it could be used for plaintiffs' intended purpose. Plaintiffs, on the other hand, claim that the Mission could have become operational within 24-48 hours, and if Falvo had diligently pursued their use variance application and correctly advised them of their rights under the law, they would have been in a position to obtain a tax exemption in 1996.

It is the use of the property, and not the status or character of its owner that determines whether a property is tax exempt. See Emmanuel Missionary Baptist Church v. City of Newark, 1 N.J. Tax 264, 269 (N.J. Tax Ct. 1980). The property must be in actual use to qualify for an exemption. Tax exemption is not available for a property or building under construction, even if its owners intend to use it for charitable purposes, if that property was not already exempt before

17

**NOT FOR PUBLICATION**

construction began. See Institute of Holy Angels v. Fort Lee, 80 N.J.L. 545, 546 (1910); Seaside
Home et al. v. State Board of Taxes and Assessment, 98 N.J.L. 110 (1922).

Although it is undisputed that 162 Broadway was unoccupied and never actually used for
a tax exempt purpose, plaintiffs allege that the property could have been operational in 24-48
hours. Plaintiffs correctly point out that only minimal use for a religious purpose is required to
sustain a tax exemption. See Roman Catholic Archdiocese of Newark v. City of East Orange, 17
N.J. Tax 298, 311-12 (Tax 1998), aff'd 18 N.J. Tax 649 (App.Div. 2000) (allowing tax
exemption despite extremely sporadic use as a church). Contrary to the Falvo Defendants'
assertions, the cases requiring actual use for charitable purposes do not require that renovation of
a property must be complete before it can be tax exempt. Presumably, part of a property could be
used for tax-exempt purposes during ongoing renovations. The Court finds that there is a
material dispute over how long it would have taken for 162 Broadway to become operational.
While some facts in the record cast doubt on plaintiffs' estimate of 24-48 hours, the Court need
not decide the issue with such precision. A full 11 months passed from the time plaintiffs closed
title on the property to the assessment date for the 1996 tax year. A reasonable jury might decide
that plaintiffs could have begun using 162 Broadway for a tax-exempt purpose during this time
period, especially given the relatively low amount of "use" required to qualify for an exemption.

The Falvo Defendants' argument that plaintiffs could not have obtained tax exempt status
because they did not have a use variance is off target. As discussed, there is a disputed issue of
material fact as to whether Falvo's own negligence prevented plaintiffs' from obtaining the use
variance.

**NOT FOR PUBLICATION**

Because the Court finds that there is a material issue of disputed fact as to whether Falvo's negligence was a proximate cause of his failure to complete plaintiffs' application for a use variance while plaintiffs' taxes were current, it is not necessary for the Court to discuss whether Falvo's failure to explore the equitable possibilities and constitutional challenges to the Long Beach ordinances caused plaintiffs' injuries. These issues were discussed in the Court's April 7, 2003 opinion, and nothing presented in the Falvo Defendants' renewed motion changes the Court's earlier analysis.

**III.    Damages**

The Falvo Defendants also argue that plaintiffs are not entitled to damages because they have not shown what injuries were suffered as a proximate cause of the Falvo Defendants' alleged breach of duty. See Lieberman v. Employers Ins. of Wausau, 84 N.J. 325, 341. The burden is on the plaintiff to show injury, and "[t]hat burden must be sustained by a preponderance of the competent, credible evidence and is not satisfied by mere conjecture, surmise, or suspicion." 2175 Lemoine Ave. v. Finco, Inc., 272 N.J.Super. 478, 488 (1994). The plaintiff must also prove actual damages, which are those that are real and substantial as opposed to speculative. See Grunwald v. Bronkesh, 131 N.J. 483, 495 (1993). The ordinary measure of damages is the amount required "to place the client in as good a position as the client would have been had it not been for the attorney's breach of duty." Saffer v. Willoughby, 143 N.J. 256, 271 (1996).

**A.    Real Estate Tax Assessment Damages**

The Falvo Defendants argue that they cannot be held responsible for the assessed real

19

**NOT FOR PUBLICATION**

estate taxes incurred between June 30, 1995 and November 14, 2003, because plaintiffs were

unable to qualify for a tax exemption based on their failure to obtain a use variance and because

they have not shown that the Mission was qualified as a tax exempt organization.  To repeat,

there is a question of material fact as to whether the Falvo Defendants were responsible for these

failures.  If a jury finds for plaintiffs, their alleged damages for the assessed real estate taxes are

measurable and were actually incurred.  For this reason, the Court finds that summary judgment

on the issue of tax assessment damages would be inappropriate.

      **B.**    **Lost Funding from the AT&T Pioneers**

      The Falvo Defendants also argue that plaintiffs cannot recover damages for the funding

revoked by the AT&T Pioneers.  The Falvo Defendants first argument relates to the timing of

the Pioneers' decision to pull the Mission's funding.  At his deposition, Dr. Ralph Wyndrum, the

former president of the local Pioneers' chapter, testified that he believed funding was pulled in

September 1994.  This statement led the Falvo Defendants to argue that they could not have been

responsible for this event, because their representation of plaintiffs did not begin until November

1994.  However, with plaintiffs' opposition brief, Dr. Wyndrum submitted a certification stating

that he was mistaken at his deposition and that Pioneers' funding was not pulled until August or

September of 1995.  In the absence of contradictory evidence, the Court will assume that the

Pioneers' pulled the Mission's funding in August or September of 1995.

      Next, the Falvo Defendants argue that the Mission could not have used the Pioneers'

funding before it was disbanded in 1996 because 162 Broadway required heavy construction,

which the Pioneers would not fund.  Dr. Wyndrum certifies that the Pioneers' funding was

20

NOT FOR PUBLICATION

pulled because the Mission's use variance application "just dragged and dragged and dragged." Wyndrum Cert. at ¶ 5. Wyndrum also certifies that while the Pioneers would not fund heavy equipment construction, they were committed to working with Reverend Brown to raise funds to cover construction costs, and that the Pioneers were committed to provide substantial assistance for the refurbishment of the property. See Wyndrum Cert. at ¶¶ 3, 4. The Court finds that Dr. Wyndrum's testimony raises a disputed issue of material fact as to whether the Falvo Defendants' alleged negligence proximately caused the Pioneers to pull the Mission's funding.

Finally, the Falvo Defendants argue that the Mission was not entitled to funding because the Pioneers only provide financial support to tax-exempt organizations. Again, plaintiffs claim that the Falvo Defendants' negligence prevented the Mission from obtaining the necessary tax exempt status. Because there is a disputed question of material fact on this point, summary judgment is inappropriate.

### C.    Lost Income

Finally, the Falvo Defendants claim that plaintiffs are not entitled to damages for lost income to the Mission and to Reverend Brown. The Falvo Defendants argue that plaintiffs' lost income calculations are highly speculative and based on inappropriate data. Plaintiffs respond that they are not obligated to calculate damages with exactitude, pointing to the distinction between proving the existence of damages and proving the actual amount of damages. Plaintiffs urge that the later is not necessarily required and argue that such a calculation is a jury question. Plaintiffs are correct in their assertion that "mere uncertainty as to the amount of damages will not preclude the right of recovery." Tessmar v. Grosner, 23 N.J. 193, 203 (1957). However,

21

**NOT FOR PUBLICATION**

New Jersey courts have uniformly required a "reasonably accurate and fair basis for the computation of alleged lost profits." J.L. Davis & Assocs. v. Heidler, 263 N.J. Super. 264, 276 (App. Div. 1993). As part of this requirement, "[a]nticipated profits that are remote, uncertain or speculative, however, are not recoverable. Perth Amboy Iron Works, Inc. v. American Home Assurance Co., 226 N.J. Super 200, 224 (App. Div. 1988); see also American Sanitary Sales Co. v. New Jersey, 178 N.J. Super. 429, 435 (App. Div. 1981) (noting that while "[i]t would be a travesty to deny a plaintiff essential justice because the absence of means of precision precludes perfect justice" a court cannot allow claims to be heard by the jury if it entails them to engage in "mere speculation"). Accordingly, courts have dismissed damage claims that are speculative and provide no reasonable basis for a jury to determine the alleged lost profits. Bell Atlantic Network Services, Inc. v. P.M. Video Corp., 322 N.J. Super 74, 101 (App. Div. 1999); Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery, 23 F. Supp. 2d 509, 516 (D.N.J. 1998).

Here, Plaintiffs' damages expert submits a report (the "Wojak Report") that purportedly sets forth his methodology for calculating plaintiffs' lost income damages. While the Wojak Report provides some background to support a determination that plaintiffs may be entitled to lost income damages for the Mission and Reverend Brown, the Wojak Report provides no information from which a jury could draw "reasonable basis for the computation of alleged lost profits" with regard to the Mission. Specifically, the Wojak Report makes the unsupportable assumption that event income would reach $100,000 within five years along with significant increases in organized contributions and individual contributions in that same time period. However, these assumptions provide no reasonable basis for how the damages could be

22

**NOT FOR PUBLICATION**

calculated absent the bald assertion that the damages are what the plaintiffs claim them to be.
This assumed lost income provides no reasonable methodology with which a jury could
determine appropriate damages and as such, this damage claim must be dismissed. Moreover,
even assuming that plaintiffs provided a reasonable basis for calculating lost income, they have
offered no evidence of costs that would offset the gross profit of the Mission. Failure to provide
this information would necessarily encourage a potential jury to resort to "pure speculation"
when determining lost profits. See Lithuanian Commerce, 23 F. Supp. 2d at 516;  J.L. Davis,
263 N.J. Super. at 276; see also Deaktor v. Fox Grocery Co., 475 F.2d 1112, 1116 (3d Cir. 1973)
(noting that "[p]laintiffs' failure to produce evidence concerning the factors essential to establish
net profit as opposed to gross profit, in effect, meant that the jury would have had to speculate as
to the amount of damages").

Similarly, the Wojak Report does not provide a reasonable basis for the computation of
alleged lost income suffered by Reverend Brown.  Plaintiffs have not provided sufficient
information from which a jury could reasonably calculate appropriate lost profits.  The Wojak
Report points to the $42,000 average salary for Baptist ministers in 2002 and based on that
number, discounted "at a reasonable rate," the report arrives at an acceptable base salary level for
1995 of $30,000.  The Wojak Report does not, however, disclose "the reasonable rate" used to
determine the 1995 salary level.  The Court is constrained to consider his $30,000 determination
as speculative.  How does one know that the proper level was not $40,000, $35,000, $25,000, or
any other amount?  No jury could rely on this opinion to reach a reasonable determination of
damages, if necessary.

23

**NOT FOR PUBLICATION**

In sum, the Court finds that plaintiffs are not entitled to seek damages stemming from the Mission and Reverend Brown's lost income because the assumed lost profits are overly speculative and provide little to no reasonable methodology for the computation of damages as required by law. Lithuanian Commerce, 23 F. Supp. 2d at 516;   J.L. Davis, 263 N.J. Super. at 276.

**D.     Non-economic Damages**

The Falvo Defendants argue again that plaintiffs are not entitled to non-economic damages such as emotional and spiritual damages. The Court already decided this issue in its April 7, 2003 opinion, where it agreed with the Falvo Defendants and held that plaintiffs were not entitled to seek non-economic damages. The Court will assume this argument was included in error, and will not discuss the issue of non-economic damages again here.

**CONCLUSION**

It is on this 22nd day of November, 2005,

ORDERED that the Falvo Defendants' motion for summary judgment is DENIED, except plaintiffs' claims for lost income with respect to the Mission and Reverend Brown, and plaintiffs' claim for non-economic damages are dismissed with prejudice.

**s/ William H. Walls**
**William H. Walls, U.S.D.J.**

24